**STATE of Missouri, Respondent,**

v.

**Cynthia A. PESCE, Appellant.**

**No. WD 71559.**

Missouri Court of Appeals,
Western District.

Nov. 30, 2010.

William J. Swift, Columbia, MO, for appellant.

Shaun J. Mackelprang and James B. Farnsworth, Jefferson City, MO, for respondent.

Before Division Four: LISA WHITE HARDWICK, Chief Judge, Presiding, MARK D. PFEIFFER, Judge and GARY D. WITT, Judge.

GARY D. WITT, Judge.

After a jury trial, Cynthia Pesce was convicted of possession of a controlled substance (methamphetamine), Section 195.202.[1] Based on this conviction, Pesce was sentenced by the trial court as a "prior offender" and "persistent offender" (Section 558.016) to five years in the Missouri Department of Corrections. For the reasons stated below, we affirm Pesce's conviction and enter an order amending the trial court's judgment of sentence.

## I. Factual Background

Cynthia Pesce was charged in the Circuit Court of Buchanan County with possession of a controlled substance for events occurring on October 23, 2008, in violation of Section 195.202. The substitute information alleged that Pesce was a "persistent offender" under Section 558.016 because she had been convicted of "two or more felonies committed at different times."

Prior to trial, Pesce filed a motion to suppress the methamphetamine in question, based on her allegation that it was unlawfully seized during an "illegal detention." After an evidentiary hearing, the trial court denied Pesce's motion to suppress.

---

1. All statutory citations are to RSMo 2000 as updated through the 2009 Cumulative Supplement, unless otherwise indicated.

Beginning on July 7, 2009, the case was tried before a jury. After the jury returned a guilty verdict on the sole count charged, the trial court sentenced Pesce to five years in the Missouri Department of Corrections as a prior and persistent offender on September 21, 2009. Pesce now appeals.

Further facts pertaining to the circumstances of Pesce's arrest and conviction will be outlined as relevant in the analysis section.

## II. Analysis

In Point One, Pesce argues that the "trial court clearly erred in overruling the motion to suppress ... methamphetamine found in Ms. Pesce's car because ... she was unlawfully detained once the check on her driver's license and registration were completed as the investigation of the alleged traffic violation of careless and imprudent driving was over such that the subsequent questioning that occurred without reasonable suspicion of criminal activity constituted an illegal detention that rendered the continuation of the encounter non-consensual and made any subsequent purported consent to search invalid."

■ The Missouri Supreme Court outlined our applicable standard of review in *State v. Sund* regarding the trial court's ruling on a motion to suppress:

A trial court's ruling on a motion to suppress will be reversed on appeal only if it is clearly erroneous. This Court defers to the trial court's factual findings and credibility determinations, and considers all evidence and reasonable inferences in the light most favorable to the trial court's ruling. Whether conduct violates the Fourth Amendment is an issue of law that this Court reviews *de novo*.

215 S.W.3d 719, 723 (Mo. banc 2007) (citations omitted). "When reviewing the trial court's overruling of a motion to suppress, this Court considers the evidence presented at both the suppression hearing and at trial to determine whether sufficient evidence exists in the record to support the trial court's ruling." *State v. Pike*, 162 S.W.3d 464, 472 (Mo. banc 2005).

■ The Fourth Amendment to the United States Constitution guarantees that individuals will not be subject to unreasonable searches or seizures. U.S. Const. amend. IV. A "seizure" occurs when the totality of the circumstances surrounding the incident indicates that "a reasonable person would have believed that he was not free to leave." *State v. Werner*, 9 S.W.3d 590, 600 (Mo. banc 2000) (quotation omitted).

■ "As a general rule, warrantless searches are considered unreasonable and, therefore, prohibited by the Fourth Amendment." *State v. Brand*, 309 S.W.3d 887, 892 (Mo.App. W.D.2010). "When a defendant moves to suppress evidence found as a result of a search that she claims violates the Fourth Amendment, it is the State's burden to show that the search was reasonable and that it was conducted under circumstances such that a warrant was not required." *Id.* "One case where a warrant is not required for law enforcement to conduct a search of an automobile is when the owner of the automobile voluntarily consents to the search." *Id.* "An officer may at any time ask a citizen whether he has contraband in his car and may ask for permission to search; if consent is given without coercion, the subsequent search is not prohibited by the Fourth and Fourteenth Amendments." *State v. Woolfolk*, 3 S.W.3d 823, 831 (Mo. App. W.D.1999).

■ "A routine traffic stop based on the violation of state traffic laws is a justi-

fiable seizure under the Fourth Amendment." *State v. Granado,* 148 S.W.3d 309, 311 (Mo. banc 2004). "So long as the police are doing no more than they are legally permitted and objectively authorized to do, the resulting stop or arrest is constitutional." *Id.* "The fact that the police may detain a person for a routine traffic stop does not justify indefinite detention, however." *State v. Barks,* 128 S.W.3d 513, 516 (Mo. banc 2004). "The detention may only last for the time necessary for the officer to conduct a reasonable investigation of the traffic violation." *Id.* "A reasonable investigation of a traffic violation may include asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose." *Id.* at 517 (quotation omitted).

■■■ Here, Pesce does not dispute that the police had probable cause to detain her for the traffic violation of careless and imprudent driving. Rather, it is Pesce's contention that on appeal that her "continued detention was illegal and made any consent [to search her vehicle] invalid."

At the suppression hearing, the only evidence presented was the testimony of Trooper John Gilliland of the Missouri State Highway Patrol. Trooper Gilliland testified that on October 23, 2008, he received notice from dispatch that various individuals had complained that a Cadillac Seville, traveling westbound on U.S. 36, "was all over the road, driving off the shoulder and coming back." Trooper Gilliland made contact with the Cadillac Seville on U.S. 36 and observed the "vehicle travel off onto the outside shoulder" of the road twice, and he then pulled the vehicle over for a traffic stop.

Trooper Gilliland next made contact with the driver of the vehicle, who identified herself as Cynthia Pesce and provided the Trooper an Iowa identification card, but no driver's license. Pesce was alone in the vehicle. After being asked by Trooper Gilliland about her erratic driving, Pesce responded that "something was wrong with one of her tires." Trooper Gilliland checked all four of the tires but found nothing visually wrong with any of them. Trooper Gilliland again advised Pesce why he pulled her over, and Pesce responded by "moving around, speaking rapidly, just kind of act[ing] nervous." The Trooper "asked her to come and take a seat" in his patrol car.

When Pesce was seated in the patrol car, Trooper Gilliland noticed that she "continued to move around in [her] seat, was moving her hand, you know, twiddling, I mean, moving her hands a lot, speaking very rapidly [and][a]t some times it was hard to understand" her. Trooper Gilliland testified that Pesce "was constantly shifting her weight in my seat, constantly looking around, even when I was talking to her." Trooper Gilliland testified that he found this conduct unusual because it was indicative of "drug involvement."

While detaining Pesce during the traffic stop, Trooper Gilliland asked dispatch to run a records check on Pesce's car registration, driver's license, and criminal background, and these records checks eventually were provided to Trooper Gilliland. There is some contradiction in the evidence as to what order the records checks came back, but it appears from the evidence that the car registration and driver's license checks came back first and the criminal background check came back a few minutes later. Trooper Gilliland testified that the check of Pesce's driver's license revealed that she had a suspended driver's license in Iowa. While Trooper Gilliland did not immediately place her under arrest for this offense, nor did the State charge her with the offense, it goes without saying that the Trooper, at that

point, could not allow Pesce to drive away in light of the fact that her license was suspended.[2] It should also be noted that Pesce was also not ever charged or written a ticket for the careless and imprudent driving charge that gave rise to the original stop.

Trooper Gilliland then asked her from where she was coming, and Pesce responded Des Moines, Iowa, which was consistent with the direction she was traveling. Between the time the Trooper was given the results of the car registration check and driver's license check and the time that the Trooper was given the results of the criminal records check, the Trooper asked Pesce if there was anything illegal in her vehicle, to which Pesce responded that there was not. Trooper Gilliland then asked for Pesce's consent to search the contents of her vehicle, and Pesce verbally consented to the search. When requesting consent, Trooper Gilliland did not threaten Pesce in any way or suggest that he would obtain a search warrant or call a drug sniffing dog if Pesce did not consent. At the time he asked for Pesce's consent to search the vehicle, Trooper Gilliland stated that while he "had observed behavior that were indicators to drug use," he "didn't have any other reason to suspect her of anything other than careless and imprudent driving" and that Pesce was not under arrest. While searching the trunk of Pesce's vehicle, Trooper Gilliland found the contraband that led to the instant charge.

At the end of the suppression hearing, the trial court articulated the following grounds to deny Pesce's motion:

I'm denying the motion to suppress and I'll tell you the reasons why is, one, it appears it was a voluntary consent.

And I know your issue is that they extended the stop by the trooper for the traffic stop. However, there's no evidence to support that. There was no evidence I heard that there was an extended length of time that the trooper held the defendant there by the side of the roadway; in other words, waiting for the criminal record.

Perhaps if there was evidence they sat there for 20 minutes or something, that might be some facts that would be more consistent with some of these other opinions. But as I understood it, he ordered these three [record checks of Pesce]. The two came right away. One came a little [bit] longer. Somewhere in that process he asked for the search. He had not issued the tickets yet. He asked to search the vehicle. She consented. He searched the vehicle and found the drugs.

It sounds to me like it was in the process of the traffic stop that he asked these questions while he was talking to her. And the trooper wasn't in the situation where he had finished the stop, given her the tickets, and then asked additional questions which is—a couple of the cases that's exactly what happened.

The trooper went ahead and issued the tickets, then in conversation asked some additional questions and asked the consent to search. And under those circumstances it was suppressed.

But that's not what we have here. We have a situation, as I view the evidence, where the trooper was in the midst of his stop for the traffic violation, asking questions of the defendant, had not issued the tickets, had not stopped

---

2. Pesce has never contended that prior to giving consent to search the vehicle that she was under arrest, and that, therefore, the police failed to advise her of her *Miranda* rights thereby violating her constitutional rights in that regard. *See State v. Brooks,* 304 S.W.3d 130, 133 (Mo. banc 2010).

the stop, and she consented to the search.

> And the Court finds the search was voluntarily consented to. And based on those findings, the Court is denying the defendant's motion to suppress the evidence seized.

On appeal, the dispositive issue is whether the Trooper's questioning of Pesce, at which time he obtained Pesce's consent to search her vehicle, constituted a "reasonable investigation of a traffic violation." *Barks*, 128 S.W.3d at 516. The trial court concluded that the detention was reasonable because it only lasted the time necessary for the officer to conduct a reasonable investigation of the traffic violation. *Id.* Based on our applicable standard of review, we find no error in the trial court's ruling.

Pesce's argument on appeal is predicated on her assumption that Trooper Gilliland's investigation "was completed when Gilliland got back the driver's license and registration checks." Because he did not obtain consent to search Gilliland's vehicle until after these two record searches were complete, Pesce argues that *any* further investigation was inherently a dilatory "continued detention" that made Pesce's subsequent consent to search her car invalid and involuntary. We disagree.

■ We do not quarrel with the legal proposition relied on by Pesce that once the investigation of a traffic violation is concluded, a motorist must be allowed " 'to proceed without further questioning unless specific, articulable facts created an objectively reasonable suspicion that the individual was involved in criminal activity.' "

*Sund*, 215 S.W.3d at 723 (quoting *Granado*, 148 S.W.3d at 311). We also do not quarrel with Pesce's position that at the time the Trooper requested her consent to search the car, he did not have articulable facts that created an objectively reasonable suspicion that Pesce was under the influence of or in possession of illegal drugs. However, Pesce fails to cite any authority that supports her argument that a "reasonable investigation of a traffic violation" *must* conclude after the driver's license and registration check is completed by the police. Pesce ignores the facts that the driver's license check revealed that her license was suspended and that the Trooper was still waiting on the criminal background check.

■ The Missouri Supreme Court has expressly held that "[a] reasonable investigation of a traffic violation *may* include asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose." *Barks*, 128 S.W.3d at 517 (emphasis added and quotation omitted). Simply put, based on the trial court's factual findings, which we must defer to, it is clear that Trooper Gilliland's investigation into the reckless driving traffic violation had not yet concluded when he asked Pesce for her consent to search her vehicle. Specifically, the trial court made the following factual findings: "There was no evidence I heard that there was an extended length of time that the trooper held the defendant there by the side of the roadway . . . It sounds to me like it was in the process of the traffic stop that he asked these questions while he was talking to her." [3]

---

**3.** As an alternate basis to attack the trial court's ruling denying the motion to suppress, Pesce focuses on the fact that Trooper Gilliland provided inconsistent testimony "as to when he sought consent and why he sought consent." Specifically, Pesce argues that Gilliland gave inconsistent testimony as to: (1) whether he knew Pesce had lied about a prior methamphetamine conviction, and (2) whether he believed Pesce's conduct was consistent

While Pesce claims that she was subjected to continued detention by Trooper Gilliland, the relevant facts herein are distinguishable from the facts of the cases she relies on because in those cases it was not disputed that the investigation of a traffic violation had in fact concluded when the police further detained the suspect in question in order to conduct a search of the vehicle. *See Sund,* 215 S.W.3d at 723–24 (holding that "the traffic stop was complete when the officer handed Ms. Sund the warning ticket, returned her license, and told her to 'be careful'" and that then "the officer gained access to the trunk only by threatening to call the dogs to come sniff the car if the women failed to open it"); *Barks,* 128 S.W.3d at 517 ("The circumstances that resulted in the charge for which Barks was convicted occurred after the patrolman completed his investigation of the traffic stop and issued Barks a traffic citation for speeding [and] Barks had remained in his pickup at the direction of the patrolman...."); *Granado,* 148 S.W.3d at 311 ("In this case, the purpose of the traffic stop was completed prior to the search. Granado committed a traffic violation, was lawfully stopped by the patrolman, and produced a valid license and registration. The patrolman checked Granado's record, gave him a written warning and informed Granado that he 'was free to go.' The purpose of the stop, to investigate a traffic violation, was satisfied....").

Here, it is clear that Pesce's consent was obtained during a *reasonable* investigation

of a traffic violation. When Trooper Gilliland requested consent to search her car, Pesce had not yet been cited for the driving infraction, nor had she had been given her identification back. Ultimately, Pesce points to *no* evidence before the trial court that demonstrated that this investigation of the traffic violation was needlessly prolonged by Trooper Gilliland beyond the confines of a reasonable search as contemplated by the Missouri Supreme Court.

■ Pesce also makes a distinct argument, almost in passing, that she did not in fact consent to the search in question because "there was no evidence that Pesce was told she could choose to refuse consent" and also because "Gilliland did not ask Pesce to give written consent." Pesce did not make these arguments before the trial court when presenting her motion to suppress, nor did she raise these specific arguments in her motion for new trial. "The defendant is bound by the arguments made and the issues raised at trial and may not raise new and totally different arguments on appeal." *State v. Winfield,* 5 S.W.3d 505, 515 (Mo. banc 1999). Even were we to reach the merits of the arguments, they provide Pesce no basis for relief on appeal because Pesce fails to cite any persuasive authority that holds that she must have been informed of her right to refuse consent prior to waiving that right. *See State v. Woolfolk,* 3 S.W.3d 823, 831 (Mo.App. W.D.1999). "Moreover, *State v. Hyland,* 840 S.W.2d 219, 221 (Mo.

with someone who had used illicit drugs, prior to asking her consent to search the vehicle. These discrepancies are not material to the core issue as to whether Pesce's consent was obtained freely and voluntarily because Officer Gilliland did *not* need reasonable suspicion in order to request that Pesce give her consent to the search. "A search pursuant to proper consent is valid even if the search is not otherwise supported by probable cause or a reasonable suspicion of criminal activity."

*State v. Howes,* 150 S.W.3d 139, 143 (Mo.App. E.D.2004). To the extent that Pesce insinuates that these discrepancies reflect on Officer Gilliland's credibility, we note that this determination was for the trial court. "In ruling on a motion to suppress, the trial court may choose to believe or disbelieve all or any part of the testimony presented by the State, even though it may be uncontradicted...." *State v. Abeln,* 136 S.W.3d 803, 809 (Mo.App. W.D.2004)(quotation omitted).

banc 1992), expressly rejected any requirement that a suspect must be told he may refuse to consent. '[A]n effective consent to search is not conditional on knowledge of a right to refuse the search.'" *Id.* (quoting *State v. Scott,* 926 S.W.2d 864, 870 (Mo.App. S.D.1996)). While a better practice is to have the consent to search in writing, no case holds that this is a prerequisite to a valid consensual search.

Point One is denied.

In Point Two, Pesce argues that the "trial court erred in sentencing [her] as a prior and persistent offender" because the State "failed to prove that she was convicted of two prior felonies as her Iowa conviction for third degree theft was a misdemeanor offense under Iowa law, and therefore, she could not be sentenced as a prior and persistent offender." We agree.

▪ Prior to the jury's verdict, the trial court found beyond a reasonable doubt that Pesce was a prior and persistent offender pursuant to Section 558.016.[4] Section 558.016.2 (2009 Cum. Supp.) defines "prior offender" to be "one who has pleaded guilty to or has been found guilty of one felony." Section 558.016.3 (2009 Cum. Supp.) defines "persistent offender" to be "one who has pleaded guilty to or has been found guilty of two or more felonies committed at different times." "The trial court must find that a defendant is a prior and persistent offender if: (1) the indictment or information pleads all essential facts warranting the finding; (2) evidence is introduced establishing sufficient facts

pleaded to warrant the finding beyond a reasonable doubt; and (3) the trial court finds beyond a reasonable doubt that the defendant is a prior and persistent offender." *State v. Young,* 230 S.W.3d 30, 34 (Mo.App. E.D.2007).

▪ Pesce does not dispute that the trial court properly found that she had been previously convicted of *one* felony of forgery (altering lottery tickets) between June and August 1994.[5] Pesce contends that there was insufficient evidence for the trial court to make the finding that she was a persistent offender because the second felony conviction relied on by the trial court does not constitute a "felony" as a matter of law.

The relevant facts pertaining to this second conviction are undisputed. On September 21, 1994, while in the State of Iowa, Pesce engaged in conduct which caused to her be charged with the crime of theft in the third degree pursuant to the Iowa Code, Section 714.2(3). Under the Iowa Code, this crime is denominated an "aggravated misdemeanor." Pursuant to her guilty plea to this charge, Pesce was sentenced to two years imprisonment in the Iowa Department of Corrections.

The instant issue on appeal turns on whether Pesce's Iowa conviction for theft in the third degree constitutes a felony or a misdemeanor pursuant to Missouri law. Section 556.016 defines the terms "felony" and "misdemeanor" as follows:

---

4. While the Amended Information charged Pesce as a prior drug offender pursuant to Section 195.275, the trial court made no finding or conclusion that she was in fact a prior drug offender.

5. Although it appears that Pesce was convicted of two felony counts of forgery in Iowa, and the Iowa Complaint from 1994 alleged she committed these crimes at "separate times," the State chose not to rely on these two felony convictions in charging Pesce as a persistent offender in the amended Information for whatever reason. Because the State was required to plead the facts in the information prior to the trial court's finding of persistent offender status, we need not be detained by this issue. *State v. Ballard,* 169 S.W.3d 893, 894 (Mo.App. E.D.2005).

2. A crime is a "felony" if it is so designated or if persons convicted thereof may be sentenced to death or imprisonment for a term which is in excess of one year.

3. A crime is a "misdemeanor" if it is so designated or if persons convicted thereof may be sentenced to imprisonment for a term of which the maximum is one year or less.

(Emphasis added.)

■ "We look to the plain language of the statute to determine whether the legislature intended" this conviction to constitute a felony for persistent offender status. *State v. Grubb*, 120 S.W.3d 737, 739 (Mo. banc 2003). "Statutory interpretation is a question of law, and questions of law are reviewed *de novo*." *State v. Simmons*, 270 S.W.3d 523, 531 (Mo.App. W.D.2008) (internal quotations marks omitted). "The primary objective of statutory interpretation is to ascertain the intent of the legislature and give effect to that intent as it is reflected in the plain language of the statute." *Id.* "When the language of the statute is unambiguous, a court must give effect to the language as written." *Id.* However, if a statute is ambiguous, and "the ambiguity cannot be resolved by resort to other canons of construction, the rule of lenity applies, and the statute must be interpreted in favor of the defendant." *Turner v. State*, 245 S.W.3d 826, 829 (Mo. banc 2008).

We conclude that Pesce's prior Iowa conviction clearly falls both within the definition of "felony" and "misdemeanor" pursuant to Section 556.016, and that, therefore, the rule of lenity must apply. The Missouri Supreme Court has interpreted the language in question that defines the term "felony" and has held that "[u]nder the plain language of Section 556.016.2, convictions may be considered felonies if they are *either* labeled as felonies *or* if

persons convicted of them may be sentenced to death or imprisonment for a term in excess of one year." *Grubb*, 120 S.W.3d at 739 (emphasis added). Accordingly, when applying this test to the Iowa conviction in question, there can be no doubt that it constitutes a "felony" because Pesce in fact was sentenced in excess of one year.

■ But it is equally clear that Pesce's prior conviction also falls within the definition of a "misdemeanor" pursuant to Section 556.016.3. Like Section 556.016.2, Section 556.016.3 sets forth a two part test in defining "misdemeanor," wherein if the conviction satisfies *either* part of the test it falls within its definition. While it is not disputed that the conviction does not fall within the later part of Section 556.061.3 because Pesce was sentenced to a two year term of imprisonment for this conviction, this fact alone is not dispositive of our statutory analysis because "it is presumed, of course, that the legislature did not insert idle verbiage or superfluous language in a statute." *Turner*, 245 S.W.3d at 828 (internal quotations marks omitted). Rather, we must turn to the first prong of Section 556.061 that states an offense is a "misdemeanor" if the crime is "so designated." Because the Iowa crime in question was designated an aggravated *misdemeanor*, it falls within the definition of Section 556.016.3 under its plain and unambiguous language.

The State attempts to analogize Pesce's "aggravated misdemeanor" conviction to a prior conviction wherein the crime was not designated a felony or a misdemeanor. The Missouri Supreme Court has held that where prior "offenses are not classified as felonies or misdemeanors ... whether [such] convictions qualify as felonies depends on the sentence that may be imposed." *Grubb*, 120 S.W.3d at 739. In *Grubb*, the Missouri Supreme Court con-

cluded in the context of a military court-marital conviction for assault, which was not designated as a felony or a misdemeanor, that because "Grubb was sentenced to confinement for eighteen months, his court-marital conviction qualifies as a felony conviction under the plain language of section 556.016.2." *Id.* at 740.

*Grubb* is not controlling because in this case the crime in question *was* designated a misdemeanor, an aggravated misdemeanor to be precise. It would, therefore, be disingenuous to pretend that it did not fall within the parameters of Section 556.016.3. Had the legislature wished that we look solely at the sentence received pursuant to the prior conviction, it would have expressly stated that legislative intent in the statute. *Simmons*, 270 S.W.3d at 531. Section 556.016 makes it clear that we are also to determine how the prior conviction in question was "so designated," and, therefore, here the prior conviction falls within the definition of a "felony" *and* a "misdemeanor." In this case, the State asks this Court to do expressly what it cannot; namely, to ignore the express language of the statute, which is unavoidably ambiguous when applied to the facts of this case.

■ "Where the legislature designates certain conduct as constituting a misdemeanor, that is what it is, regardless of the punishment that can be imposed under the statute." *State v. Heistand*, 714 S.W.2d 842, 848 (Mo.App. S.D.1986). In *Heistand*, the Southern District dealt with the issue of how to classify the crime formerly known as "credit card fraud" (Section 561.4.15, RSMo 1969) in determining whether it was a felony for persistent offender status. *Id.* While punishment of the crime carried up to five years in prison pursuant to the statute, the Southern Dis-

trict focused on the fact that the statute expressly provided that when one committed the crime of "credit card fraud" that such individual was "guilty of a misdemeanor." *Id.* Accordingly, the Southern District concluded that sentencing defendant as a persistent offender was improper when only one of two prior convictions was for a felony. *Id.*

■ We acknowledge that this case deals with a prior conviction denominated as a "aggravated misdemeanor" as opposed to one denominated simply as a "misdemeanor," but this simply highlights the ambiguity we face because this prior conviction does properly fall within both definitions outlined in Section 556.016. "Under the rule of lenity an ambiguity in a penal statute will be construed against the government or party seeking to exact statutory penalties and in favor of persons on whom such penalties are sought to be imposed." *State v. Graham*, 204 S.W.3d 655, 656 (Mo. banc 2006).

For all of these reasons, we conclude that the trial court erred in sentencing Pesce as a *persistent* offender. However, because the State did not improperly use Pesce's alleged persistent offender status to enhance the class C felony charge of possession of a controlled substance to a class B felony pursuant to Section 558.016, and because the trial court properly sentenced Pesce within the range of a prior offender for a class C felony to five years imprisonment, the error did not have an impact on the length of Pesce's sentence. Nor did this error improperly take away Pesce's right to jury sentencing in light of the fact that it is not disputed that Pesce was properly found to be a "prior offender," and "a prior offender ... is not entitled to jury sentencing." *State v. Teer*, 275 S.W.3d 258, 262 (Mo. banc 2009).

Therefore, pursuant to our plenary powers, we enter an order amending the trial court's judgment, sentencing Pesce as a *prior* offender to five years in the Missouri Department of Correction. Rule 30.23.[6]

Point Two is granted.

## Conclusion

The judgment of the circuit court, as amended, is affirmed.

All concur.

---

**6.** All rule citations are to the Missouri Supreme Court Rules (2010), unless otherwise indicated.